

1

Mr. Piero A Bugoni Pro - Se
160 W. Camino Real #191
Boca Raton FL 33432

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF MARYLAND

Piero A. Bugoni Individually,
      PLAINTIFF

vs.

Employment Background
Investigations Inc.,
      DEFENDANT

Case No.:

**COMPLAINT**

**JURY DEMANDED**

### I. Jurisdiction And Venue

1)    This Court has Jurisdiction per Article III of The United States Constitution.

2)    This Court has Jurisdiction because the Parties to this matter reside in operate a Corporation in, or are Citizens of multiple of the Several States.

3)    This Court has Jurisdiction because the Federal Questions presented are pursuant to 15 U.S.C. § 1681 et seq., herein The "FCRA".

4)    This Court has Supplemental Jurisdiction over questions of Maryland State Law as they may have an inseparable Nexus to the Federal Questions raised.

5)    This Court has Jurisdiction because the amount sought by Plaintiff for Damages, exceeds $75,000.

6)    Failure of this Court to take Jurisdiction of this matter is Treason to the Constitution. *Cohens v. Virginia*, 19 U.S. 264, (1821).

7)    Venue is proper herein because the acts of Defendant were committed in the State of Maryland, and because Defendant is a Maryland Corporation and does headquarter in Owings Mills.

28

## II. Parties:

8)    Plaintiff Piero Bugoni, an Individual.

9)    Employment Background Investigations Incorporated, a Corporation, doing business as a Consumer Reporting Agency.

## III. Facts Common To All Counts

10)   Supporting Exhibits referenced infra are Plaintiff's Exhibits 1 – 9, Case Number 1:19-CV-01711-RDB, This Court.

11)   Plaintiff is an Individual, and appears here thereas, In Propria Persona.

12)   Plaintiff is the President of BallCam Technologies Inc., and appears herein as such to the extent that he is an employee of that corporation, or a sole-proprietor individual in contract with BallCam, to perform services on behalf thereof, to other parties.

13)   BallCam Technologies Incorporated is a Corporation, an Artificial Person, and is incorporated in the State of Florida.

14)   BallCam Technologies Incorporated, (The Corporation Itself), is not a Party to this matter, but is hereafter referred to by name, or abbreviated simply as "BallCam", or as "Plaintiff's Corporation".

15)   Plaintiff is the sole employee, shareholder and director of BallCam Technologies Inc., and is the Prime Benefactor of that Corporation's Business.

16)   As a Small Business, Plaintiff must offer Individual, (not Corporate), guarantee to all creditors. As such, Plaintiff individually is also the Prime Debt Holder for BallCam

1

Technologies Inc., and holds the sole responsibility and burden of maintaining the Financial Viability of that Corporation, and paying its Debts.

17)   BallCam Technologies Inc. did contract with a client named ValueMomentum Incorporated, not a party to this matter, to perform services for one year. (Hereafter referred to as "ValueMomentum", or the "Client", and the "Contract").

18)   Defendant "EBI" interloped in that business circumstance without Plaintiff's consent, and against Plaintiff's will, and caused that Contract to be terminated by making false claims about Plaintiff to the Client of Plaintiff's Corporation, and by furnishing a Consumer Report relating to Plaintiff to the Client of Plaintiff's Corporation, when the furnishing of such a report to that Client was prohibited by FCRA § 1681b.

19)   Defendant interloped by executing a "Master Services Agreement" with the same Client that Plaintiff's Corporation was doing business with, for the commercial purpose of directing or inducing that Client to not do business with nor employ Plaintiff and other parties similarly situated.

20)   BallCam Technologies Incorporated pays Plaintiff a gross annual payment of $1.00 per year, regardless of in which taxable status BallCam Technologies Inc. employs Plaintiff.

21)   Plaintiff is employed by BallCam Technologies Incorporated, and receives a gross annual payment of $1.00 per year, regardless of in which taxable arrangement he performs that work.

22)   As the sole officer of BallCam Technologies Incorporated, BallCam Technologies Incorporated compensates Plaintiff in the form of paying Plaintiff's living expenses,

28

including but not limited to Room and Board, Personal Transportation, Clothing and

1

Medical Care, and ordinary Life Sustenance.

23)    Since the time the actions of Defendant alleged in this Complaint have occurred, BallCam Technologies Inc. has been unable to offer any valuable consideration to Plaintiff in the form of Room and Board, Personal Transportation, Clothing and Medical Care, nor ordinary Life Sustenance, as it previously had but for the interloping by Defendant.

24)    BallCam Technologies Inc has closed both of its two Corporate Facilities, and been unable to provide Plaintiff a sleeping room in exchange for Plaintiff's annual labor as its President, and Sole Employee, due to the actions of Defendants.

25)    BallCam Technologies no longer provides ad-hoc personal transportation to Plaintiff. Because of corporate liability insurance requirements, Plaintiff was constrained to rent a motor vehicle, and not own one personally.

26)    BallCam Technologies Inc. no longer provides Plaintiff with a "Break Room" in one of its facilities in order for Plaintiff to prepare meals, nor subsidizes the cost of purchasing that food for Plaintiff, in exchange for annual labor as it's President, due to the actions of Defendant.

27)    BallCam Technologies no longer subsidizes the ordinary necessities of life such as Clothing for Plaintiff, so that Plaintiff may operate as President and Employee of BallCam Technologies Inc, due to the actions of Defendant.

28)    Beyond the $1.00 Annual Stipend paid to Plaintiff, BallCam technologies Inc. no longer grants any other valuable consideration to Plaintiff in exchange for Time and Effort by Plaintiff dedicated to generating Revenue to pay the business expenses of BallCam, due to the actions of Defendant.

28

1

29)   Plaintiff must continue to perform services on behalf of BallCam to other parties in order to meet his annual obligations to BallCam Technologies Incorporated, but is unable to because of the actions of Defendant.

30)   Plaintiff must continue to perform services on behalf of BallCam to other parties in order to meet the daily, weekly and monthly obligations to the Creditors of BallCam Technologies Incorporated, but is unable to because of the actions of Defendant.

31)   Given the ordinary societally accepted work-week of Forty Hours spent over five days, with two days off, then no less than 70% of Plaintiff's available Personal time is dedicated toward business with or for BallCam Technologies Inc. As President of single-person Corporation, Plaintiff's contribution of his his personal time is closer to 100%

32)   BallCam Technologies formerly donated up to $9000 annually, to the American Justice Corporation. That non-profit corporation assisted with payments toward medical care for Plaintiff's Family, payed or assisted in raising funds to pay fees and costs for Individuals bringing Civil Rights cases Pro Se, in United States Courts, and did make other ad-hoc petty-cash charitable contributions to financially disadvantaged others. Plaintiff is the sole founder, president, operator and employee of that Corporation and uses that Corporation as a vehicle to perform the Charitable Purposes stated in this Paragraph. Plaintiff is no longer able to act as such, nor provide medical care for Plaintiff's Family due to the actions of Defendants.

33)   The terms of the Contract with its Client were that BallCam Technologies Inc. would be payed $75.00 Per Hour for every Hour that Plaintiff provided in Service to the Client, up to a maximum of Forty Hours per week, from 1 April 2019 until 31 March 2020. Per the agreement between BallCam Technologies Incorporated and that Client, BallCam

28   Technologies Incorporated, (not Plaintiff), was to be the recipient of all payments. (See: Ex.

1

1, "Master Services Agreement" between BallCam and ValueMomentum). Plaintiff himself, would be compensated in turn, by BallCam Technologies, as described supra.

34)   Plaintiff began actual work toward the fulfillment of that Contract on 8 April 2019. Plaintiff reported to the Client's Job-Site for on-site deployment on 15 April 2019, and began on-site work there on that date. Per the terms of the Contract, Plaintiff was to deliver that work on-site, until 31 March 2020. That Contract was terminated on 17 April 2019, at such time as Defendant "EBI" furnished its Report to the person procuring it. That Report was cited exclusively as the cause for the termination of the Contract between BallCam and its Client. As such, Defendant's Work Product, their "Article In Commerce", namely a "Background Check", or "Consumer Investigative Report", destroyed a Contract between BallCam Technologies Inc., and its Client, that was already in place, had been signed and agreed to between the authorizing parties, and for which actual work was in-progress. At no times during any event that is Cause for this matter did BallCam Technologies Incorporated agree nor consent to, request, nor in any way desire, Defendant "EBI" to participate in its business in any way. At all times, as President of BallCam Technologies Inc., and Individually as well, Plaintiff has every interest and desire to permanently prohibit any participation whatsoever by "EBI" from his existence in every way, and now as well, a tortious burden imposed upon him by Defendant "EBI" to do so.

35)   The payment terms of the Contract that Defendant destroyed did not offer nor guarantee any kind of presumptive nor fixed number of Billable Hours. As such, its value can be determined retroactively by the value of the work performed by some other party in replacement of that Contract, or in the loss incurred by the Customer of that Contract, for not having the work performed due to Defendants actions.

36)   In the absence of any fixed number of Billable Hours specified by the Contract, as an

28

Independent Contractor, Plaintiff, and BallCam determine the number of Billable Hours to

1

work, and in all cases, delivers forty hours of Billable Work, per calendar week, unless requested otherwise by the Client, or otherwise notified to the Client weekly by Plaintiff.

37)   Defendants destroyed a Contract wherein BallCam Technologies Inc. was a subcontractor of a Prime Contractor, ValueMomentum who is a "Strategic Partner" to the ultimate recipient of services provided by BallCam Technologies Inc., which deployed Plaintiff, to individually deliver the actual work product to that end client. As such, the circumstances in which Defendant furnished a Consumer Report to a person procuring it was that of two Corporations, (Artificial Persons), engaging in inter-corporate Commerce. For this reason Defendant's conduct was in violation certain provisions of the FCRA because the Contract in effect was not an "Employment" circumstance, but a Service Contract.

38)   As a Subcontractor BallCam Technologies Inc. held a Prime responsibility to decide when and how much time and effort to contribute during any span of time, (up to the maximum requested by or agreed with the Client). This is a prime distinction between "Contractor" and "Employee" both in Fact and in Employment Law. If there is no requested service to perform at at particular time, a subcontractor typically will not bill for any payment during this period unless some sort of retainer agreement was in place. The Contract described herein made no such provision. That is, the Contract between BallCam and ValueMomentum did not specify that it was for "Employment Purposes", nor did it specify how or when Plaintiff would deliver his Work Product.

39)   For the period of time from inception of the Contract to the time of its termination caused by Defendant, that BallCam Technologies Inc. did provide services to its Client pursuant to that Contract, BallCam Technologies Inc. submitted a total Invoice in the amount of $8929.25. (Ex. 2).

28

1

40)     Afterward, BallCam Technologies received communication from its Client regarding that Invoice. They disputed the amount, and attempted to conflate it with a release of liability for the value of the remainder of the Contract. They offered a "Settlement" amount of $8,929.25, but they withheld that Payment unless Plaintiff agreed to release them from such liability. (Ex. 3).

41)     On 23 May 2019, BallCam Technologies Inc. received payment in the amount of $8929.25 from its Client, for the amount Invoiced to them. That Client has indicated that that is the total amount that they intend to pay for the Contract between them.

42)     For the purposes of tolling time, this would be the earliest date that Plaintiff became aware of any FCRA violation. During the time between the date the Consumer Report was furnished by Defendant to the Client, and the date that Plaintiff's Corporation was payed, Plaintiff did attempt to continue the Contract with the Client. Likewise Plaintiff was in communication with the Client until mid-June of 2019, attempting to re-establish business. During this time Plaintiff also sent a letter to the CEO of the customer that the Client was providing Plaintiff's services to. That customer responded to Plaintiff, indicating that it would investigate and contact Plaintiff with their findings. For these reasons, Plaintiff considered there to be some possibility of continuing business with the Client, until at least mid-June 2019. (Ultimately the customer the Client was serving never contacted Plaintiff regarding any findings or anything else). There were communications between Plaintiff and a lawyer hired by the Client regarding payment, however that attorney had no authority to make business decisions on the part of the Client. Plaintiff does not recall when he received a copy of the Consumer Report that was furnished by Defendant to the Client, nor when he became aware that the FCRA prohibited Defendant from furnishing a Consumer Report in the circumstances they did. The date Plaintiff received payment was the first upon which Plaintiff received any kind of notice that the Contract business between BallCam and its Client would not continue. After some further attempt to continue business with the Client

28

1  into June of 2019, and receiving no communication from them, Plaintiff considered the business to be ended. At Some point after that Plaintiff began the process of determining if an FCRA violation had caused that business to end.

43)   Ultimately Plaintiff did find FCRA Violations as follows:

The FCRA prohibits the investigation that was performed by Defendant, in the circumstances they did.

The FCRA prohibits reporting Records without an individual's written instructions. Plaintiff did not instruct Defendant to report anything about him ever.

Plaintiff does not and did not consent to Defendant "EBI" involving itself in Plaintiff's Life, Employment, Personal Affairs, Business, nor in Plaintiff's existence in ANY WAY, and did not consent to Defendant "EBI" reporting any information about him, nor to ever report any court case in which Plaintiff was a defendant.

44)   In all cases and at all times, as in the instant case it is the ordinary use of Defendant's Article In Commerce that it is used at a stage in the pursuit of Business or Employment between Parties whereupon a particular individual has been selected or "confirmed" as the person desired to perform that work. They have been selected based on evaluation of their ability to meet the relevant practical Employment or Business criteria. Literally, they "have the job", and the initial process of Business or Employment has reached a stage where contractual elements are in place. There has been an offer, acceptance thereof, an exchange of valuable consideration, and mutual obligations have become in place. It is at that stage in the fulfillment of an Employment or Businesses contract that Defendant interlopes, and by whatever false pretenses, fraud, deceit, or artifice, convinces the party acting as the "Employer" either not to employ or contract business with a prospective employee or corporation, to terminate employees currently employed, and as in Plaintiff's case, to terminate a Contract that had been fully executed by its authorizing parties, was fully in

28  effect, and for which Plaintiff had already begun actual work, and was in the process of

1  | fulfilling.

45)   Likewise it is the Ordinary use of Defendant's Article In Commerce that the Consumer to whom the Report relates only obtains a copy after the Procurer, and then is obliged to waste more of their time attempting to correct any false or misleading information furnished through the worthless "dispute" or "correction" process that Defendant "EBI" avails. That process is worthless because in all cases it fails to undo the actual damage that is done by Defendant's Service, as described in this Complaint, damage all of which can be avoided by providing the Subject of the Report a copy first, and an opportunity to either correct the Report, or withdraw their consent entirely. Defendant's "dispute" process exists only to then frustrate and further antagonize persons already harmed, with more deceit and false pretenses, and to further harm them by wasting more of their time with false pretenses, only to take more from them by giving them nothing in return for their time and effort. At all times Defendant "EBI" does this knowingly, maliciously, willfully, and intentionally for the purpose of prohibiting persons who have been charged with crimes from ever obtaining employment, to interfere with their contractual relations, to vex, harass and annoy such persons, to embarrass and humiliate them in front of others, and to create negative perceptions about them in the minds of others so that those persons will suffer constant social rejection, distrust, and will always be held in suspicion.

46)   The corporation, "Employment Background Investigations Incorporated" was specifically formed for this purpose. At all times, Defendant knows what it does, and the emotional, financial, familial and life harm that it does to others, and intentionally causes that harm to persons deliberately for the purposes of harming others in order to generate revenue and profit therefrom.

47)   At the time of filing this Complaint, and as a result of Defendant's actions, BallCam

28 | Technologies Incorporated is no longer generating Revenue as before, and does not at the

1

Current time have any Client or Business that is a replacement for that which was destroyed by Defendant "EBI", and Plaintiff himself must spend all his time in the activity of acquiring new customers, which only costs him and his Business financially, but generates no revenue. As such, Plaintiff has now had to vacate both of his corporate facilities, sell off corporate assets, and reduce business operations and costs to the absolute minimum to stay in business, and to cease such business temporarily. In short, Defendant's actions caused a Corporation who was in no way a party to the agreement to procure Defendant's Product, and which in no way solicited Defendant's involvement in its Business in any way, to lose that Business completely, and at the current time be out of Business entirely.

48)   At the time of filing this Complaint, in the previous Complaint related to this matter, the Client of Plaintiff's Corporation, has accused Plaintiff and BallCam Technologies Inc. of beaching the contract between them by failing to prior disclose the material that was presented to them by Defendant's Report.

49)   That Client has now additionally accused Plaintiff of making the false representation that he has not ever been a defendant in a criminal case because he chose not to disclose that he has, and because he did not do so in advance of any other discussion.

50)   As such, Defendant's Report furnished to Plaintiff's Client caused that Client to terminate the Contract with Plaintiff's Corporation, because by and through that Report, the furnishing thereof, which is Defendant's Article In Commerce, Defendant did falsely and misleadingly claim to, notify, or inform the Client of Plaintiff's Corporation:

   That The Contract between them required Plaintiff to disclose in advance the contents of Defendant's Report.

   That Plaintiff was not qualified to work for or do business with the Client.

   That Plaintiff has an obligation to disclose the contents of Defendant's Report to

28   other persons or corporations.

1

That Plaintiff's Corporation was a "Scheme" to avoid disclosing the contents of Defendants Report.

That Plaintiff was breaching the Contract because he did not prior disclose the contents of Defendants Report.

That Plaintiff is at fault for not disclosing information that no person has any obligation to disclose to others.

That Plaintiff was making a false representation to the Client because he did not disclose the contents of Defendant's Report in advance of any business, employment or other discussion.

That it was legal for Defendant to furnish the Report when at minimum it was a non-criminal FCRA violation, and possibly a felony.

That it was legal for the Client to procure the Report from Defendant when doing so is a felony.

That persons who have been charged with crimes falsely represent that they have never been charged with crimes by not giving other parties notice of that in advance of business or employment discussion.

That persons who have been convicted of crimes falsely represent that they have never been convicted of crimes by not giving other parties notice of that in advance of business or employment discussion.

## IV. Cause Of Action

51)   The facts stated in Section III of this Complaint are incorporated by reference in all Counts infra. Each Count states additional facts relevant to that particular Charge.

52)   Supporting Exhibits are Plaintiff's Exhibits 1 – 9, Case Number 1:19-CV-01711-RDB, This Court.

28

1

53)   The "CONSUMER REPORT AUTHORIZATION" mentioned infra is Defendant's Exhibit B, (Document 12-4 ), Case Number 1:20-CV-01133-SAG.

**Count 1: FCRA Violation**

Furnishing A Consumer Report Without The Written Instructions Of The Consumer To Whom It Relates.

54)   Plaintiff did not write the "CONSUMER REPORT AUTHORIZATION" that Defendant claims are Plaintiff's Written Instructions. None of the content of that document are Plaintiff's written instructions. The "CONSUMER REPORT AUTHORIZATION" form that was presented to Plaintiff is not FCRA-Compliant because:

55)   It is presented in an adhesive manner, namely via a computer screen, or other such form where it cannot be amended by a Consumer. The Consumer is only given the opportunity to sign it as-is. That is, the content of that form is written solely by Defendant, and Plaintiff was not given any means nor facility to write any part of it, and only to agree to it as written by Defendant.

56)   Nothing in that form indicates that it constitutes a person's Written Instructions per FCRA § 1681b(a)(2). As such that document fails to give sufficient notice that it will be operating as such, and is deceptive.

57)   As such the Consumer Report furnished by Defendant to the Client of Plaintiff's Corporation  was furnished without any written instructions of Plaintiff's and without any instruction written by Plaintiff, in violation of FCRA § 1681b(a)(2).

58)   Because Defendant used their own written instructions as Plaintiff's and did furnish a Report to the Client of Plaintiff's Corporation, and that Report caused Plaintiff to lose the

28

1

business with that Client as described supra, and that Report was unlawful as described in this Count, Defendant is liable for the value of lost business caused by unlawful furnishing of their Report to the Client.

**Count 2:**

False Pretenses, Fraudulent Representations, Deceptive Business Practices

59)   The facts stated in Count 1 supra are restated herein as supporting facts to this Count.

60)   Defendant falsely represented to Plaintiff that he was engaging in the common practice of signing a typical "consent form" or release of liability when in fact it was writing the Consumer's Instructions, and using that deceptive practice to illegally circumvent the FCRA, in order to profit from the business of furnishing Consumer Reports. In all cases, Defendant must use this deceptive practice in order to profit from furnishing Consumer Reports Because if Defendant allowed Consumers to instruct it as to the nature and scope of the Consumer Investigation antecedent to the Reports it furnishes, Consumers would have a compelling and beneficial interest in tailoring the Consumer Report to emphasize beneficial information, and to omit information that would result in Adverse Action being taken by the procurers of those Reports, against the Consumers to whom those Reports relate.

61)   Because Defendant is in the business of furnishing Consumer Reports to persons who intend to use the information contained in that report for Employment Purposes, (hence its name, "Employment Background Investigations" Incorporated), and by its own admission for illegally investigating contractors and volunteers as well, and because in all cases the "Employment Purpose" for which those Reports are used by the procurers thereof is to take Adverse Action against the Consumers to which those reports relate by denying them Employment, all Consumers have a compelling interest in instructing Defendant to omit any

28

information from the Report furnished that would result in such Adverse Action.

1

62)    In all employment-purposed uses of Consumer Reports, the persons procuring the Consumer Reports furnished by Defendant procure the Report *after* the Consumer to whom it relates was selected to be an employee, because the procurers of the Consumer Reports must pay for them, and it can be an order of magnitude or more cost-effective to only procure a Report for the person or persons actually to be employed rather than to investigate all applicants. This is because it is not uncommon for an Employer to receive between ten and one-hundred applicants for any one person they actually select, and because procuring a Consumer Report does require the Employer to perform some extra labor in addition to the rest of the employment selection process. This additional financial, labor, and time cost compels Employers to limit the procuring of Consumer Reports to only those persons that are selected to be hired. Because they are used this way, this indicates that the Consumer Reports are furnished by Defendant so that Employers may discover if cause exists (whether legal or not) to deny employment to a particular Consumer, and not for the purpose of determining applicants practical qualifications.

63)    In all cases, including the instant case, the Consumer Reports that Defendant furnishes are for the predominant purpose of disclosing to the procurer that the Consumer has been charged with or convicted of crime, so that the procurer may deny employment, contracts and volunteer opportunities to the Consumer for that reason. ("CONSUMER REPORT AUTHORIZATION", ¶ 1). However, the disclosure of criminal records regarding a particular Consumer is not the only information that could result in such Adverse Action being taken against that Consumer. While the number of possible scenarios is beyond conjecture, possibly any information related to a particular Consumer could trigger a bias on the part of an Employer, resulting in Adverse Action. Residence information might trigger a bias that an Employer has against people from a particular part of the country. Prior employment information might trigger a bias that an Employer has against people who have worked in certain jobs. Education information, or information revealing that a person belongs to a particular religious or ethnic group might trigger bias by an Employer that

28

1

results in denial of Employment on those grounds. A Consumer Report is certainly capable of disclosing information that would cause an Employer to illegally discriminate against that Consumer in violation of 42 U.S. Code, Chapter 21, Subchapter VI. It is certainly capable of revealing a person's race, color, national origin, gender, and religion, when that information might not be previously known by the employer.

64)    For all these reasons, Consumers have a compelling interest in preventing such Adverse Action, and may do so because of the lawful protection that FCRA § 1681b(a)(2) affords them. But likewise, because procurers of the Reports furnished by Defendant always want them to disqualify persons, and take Adverse Action against them, or at minimum to determine if any reason exists they consider grounds to do such, Defendant must preserve that value to its customers by furnishing Consumer Reports whose nature and scope match that desired by the procurer, and prevent Consumers from limiting the nature and scope of the report to that which reflects the Consumer's best interests. In order to do this, Defendant must write the Consumer's instructions required by FCRA § 1681b(a)(2), and then use the false pretense and fraudulent representation that the Consumer did so. Defendant does this by disguising those written instructions as a "consent form", or "CONSUMER REPORT AUTHORIZATION", and obtaining a Consumer's signature thereupon.

65)    In the instant case, Defendant did exactly that, and upon furnishing a Consumer Report relating to Plaintiff to the Client of Plaintiff's Corporation did cause that Client to terminate its Contract with Plaintiff's Corporation because it disclosed information related to Plaintiff to the procurer of the Report, that Plaintiff knows and has cause to know would result in Adverse Action if disclosed, and but for Defendant fraudulently obtaining Plaintiff's "written instructions" in the form of a "CONSUMER REPORT AUTHORIZATION" Plaintiff would have instructed Defendant not to disclose that information.

28

1

66)    Because of this Defendant is liable for the lost compensation Plaintiff would have received but for the lost business between Plaintiff's Corporation, and its Client, caused by Defendant's conduct alleged in this Count.

**Count 3: FCRA Violation**
Failure To Disclose Nature And Scope Of The Investigation.

67)    The facts stated in Counts 1 and 2 supra are restated in this Count as supporting facts herein.

68)    As described in this Count, "Company" is the Client in Contract with Plaintiff's Corporation, to which Defendant unlawfully furnished a Consumer Investigation Report relating to Plaintiff.

69)    The "CONSUMER REPORT AUTHORIZATION" that Defendant unlawfully used as Plaintiff's "Written Instructions" said nothing about furnishing criminal records to "Company", nor reporting them in any way. The paragraph, (paragraph 4), which lists the type of "background information" to be furnished, fails to mention that records of criminal charges and convictions will be retrieved and reported to "Company". Likewise for the sources of that "background information" listed, the "CONSUMER REPORT AUTHORIZATION" does not mention that any Court will be used as a source. It mentions the phrase "local, state or federal agency", but Courts are not agencies. In fact, the "authorization" that Defendant EBI wrote requires Plaintiff to contact EBI to obtain disclosure of the nature and scope of the investigation, rather than EBI disclosing it prior to the investigation.

70)    Because willfully and intentionally does not disclose that criminal records will be

28    reported, and because in all cases the reporting of criminal records for the purpose of

1

Adverse Action is the predominant use of Defendant's Article In Commerce, and because Defendant does not disclose this to Consumers prior to investigating, the "CONSUMER REPORT AUTHORIZATION" is null and void, and cannot authorize anything.

71)     Because Defendant failed to disclose the Nature and Scope of the Investigation, Plaintiff cannot be deemed to have consented to the Investigation that was done, and as such Defendant is liable for whatever lost businesses that was caused by furnishing the Report from that investigation to the Client.

**Count 4: FCRA Violation**

No Consent To Investigation Per 15 U.S. Code § 1681b(b)(2)(B)(ii)

72)     Because The Court may construe the circumstances in which Plaintiff and the Company named "Value Momentum" were involved to be "Employment" rather than contractual inter-corporate commerce, even though there is no conceivable reason for it to do so, Plaintiff claims that there was no sufficient consent per 15 U.S. Code § 1681b(b)(2)(B)(ii) based on the language of the "CONSUMER REPORT AUTHORIZATION", and that the only consent that was given was for "Company" "ValueMomentum" to procure a report. (Not for EBI to furnish one), nor did Plaintiff consent to any criminal case in which he was a defendant being reported, as described supra, and in Plaintiff's related Complaint. Likewise no consent was given for Defendant to make any claim about Plaintiff of any kind to any party, publicly or otherwise, nor was any consent given to Defendant to interlope in, interfere with, disrupt, nor affect in any way, Plaintiff generating revenue.

73)     As such, Defendant is liable for whatever losses they caused Plaintiff regardless of what Work-Producing relationship he was in with the Client.

28

I

**Count 5:**

Tortious Interference With Contractual Relations:

74)   Defendant committed Tortious Interference With Plaintiff's Contractual Relations
Because:

A Contract was in place between Plaintiff's Corporation and its Client,
ValueMomentum.

That Contract was actual, not prospective, and delivery by Plaintiff on his
obligations to that  Contract had begun.

Plaintiff began that delivery at the request of the Client.

75)   While that Contract was in the normal process of being executed to completion,
Defendant EBI interloped into that Contract by executing a Master Services Agreement with
that same Client for the purposes of furnishing an article in commerce to that same Client.

76)   Because that article in commerce is information relating to Plaintiff and Defendant did
furnish it to the Client, that constitutes interloping on the part of Defendant EBI.

77)   That interloping was tortious because:

The article in commerce they furnished is regulated by the FCRA and was furnished
in violation of multiple provisions of the FCRA.

The information they furnished to the Client relating to Plaintiff contained false and
misleading information in the form of a false accusation, claim, or notice that Plaintiff had
falsely represented to that Client that he had never been charged with nor convicted of a
crime.

Defendants claim to the Client that Plaintiff had made false representations to them
is based in the premise that a person who has been charged with or convicted of crimes
makes a false representation to others that they are a person who has never been charged

28

1   with nor convicted of a crime, unless they disclose that to others in advance of any other discussion with them.

Defendant has no legitimate business purpose in claiming to any person that Plaintiff made false representations by not disclosing some information, because no person has any obligation to disclose anything to others,

Defendant has no legitimate business purpose in accusing others, or notifying or informing some party that some other party has made false representations, or committed any other tortious act.

78)   That interloping did interfere with Plaintiff's contractual relations because after being furnished with Defendant's article in commerce the Client chose to terminate The Contract with Plaintiff's Corporation.

79)   This is evident because prior to the furnishing of Defendant's article in commerce, Plaintiff was in business with the Client. Upon being furnished with Defendant's article in commerce the Client chose to terminate the contract with Plaintiff's Corporation because of the content of that article. But for the furnishing of that article the Client would not have terminated business. And, as has now been discovered in the related matter, the Client repeats the claim that was stated to them by Defendant, namely that Plaintiff made a false representation by choosing not to mention that he has been convicted of crimes.

80)   Plaintiff individually suffered economic loss and injury because of Defendant's Tortious Interference with the Contractual Relations of Plaintiff's Corporation, as described supra.

81)   Because of this, Defendant is liable for that economic loss and injury caused by their tortious interference wit Plaintiff's business relations.

28

1

**Count 6:**

Unlawful Imposition Of Collateral Consequences

82)    Defendant is a private party and has no right nor authority of any kind, to impose collateral consequences upon any other party nor any legitimate business purpose in doing so.

83)    Collateral Consequences may only be imposed by Law, and Defendant has no such authority.

84)    Defendant did without lawful authority impose collateral consequences upon Plaintiff by causing Plaintiff to lose Corporate Business with the Client, by furnishing an Article In Commerce whose sole purpose is to inform others that a particular Consumer has been named as a Defendant in a criminal case, so that those others may deny employment, contract business, and volunteer opportunities to Consumers, because they were named as defendants in criminal cases.

85)    Defendant did furnish that Article In Commerce to a Client of Plaintiff's Corporation for that purpose and because of that the Client did terminate contract business with Plaintiff and Plaintiff's corporation, after it had been successfully acquired by Plaintiff.

86)    Because of this Plaintiff individually suffered economic injury in loss of compensation from and employment and volunteer opportunity with his Corporation, and contract business with the Client of his Corporation.

87)    Because Defendant has no conceivable legal authority to impose collateral consequences upon Plaintiff because has been named as a Defendant in a criminal case, they

28    are liable for the economic loss caused by those consequences.

1

**Count 7:**

Furnishing A Toxic, Dangerous Or Defective Article In Commerce.

88)   This Court has ruled in Plaintiff's related Complaint that Defendant's Article In Commerce is not a "Product". For the purposes of this Count, Defendant's Article In Commerce is referred to as its "Work Product" and any use of the word "Product" in reference to Defendants Article In Commerce, refers to it as the Work Product that Defendant provides to other parties or furnishes in exchange for monetary revenue, or any other thing of Value.

89)   The Report furnished by Defendant EBI clearly states that it "does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation..." (Ex. 9):

Notice :   This report does not guarantee the accuracy or truthfulness of the information as to the subject of the investigation, but only that it is accurately copied from public records, and information generated as a result of identity theft, including evidence of criminal activity, may be inaccurately associated with the consumer who is the subject of the report.

Employment Background Investigations Inc. will accurately report all information as received. The information in this report is gathered from sources deemed by Employment Background Investigations to be reliable, however Employment Background Investigations cannot be responsible for the content of information received from an outside source.

SUBJECT.DETAILS
Printed: 04/16/19 02:28 PM EDT

justOne.ebiinc.com

Piero Alessandro Bugeni
Page 1 of 11

90)   Defendant's Work Product is defective because the method used to create it, (automated, non-human, electronic information aggregation), fails to actually examine the contents of Court Records, nor their associated Case Files nor comprehend their meaning, and because of that fails to withhold Records from a Consumer Investigative Report that are explicitly suppressed from such reports by an Individual, in addition to failing to withhold Records that are explicit violations of the FCRA.

91)   Defendant's Work Product is defective because it fails to properly convey any material whatsoever used in making legitimate employment decisions by hiring parties. The material contents of the Reports produced show no information that could be used to qualify any

28

1    person for any job other than perhaps employment by a criminal enterprise. The Information

presented is exclusively sold for the purposes of disqualifying persons, and any sale of a

Consumer Investigative Report whose purpose is to disclose prior criminal convictions, is

only for the purpose of assisting a Criminal Enterprise in finding qualified employees, if that

Report is sold for *qualifying* purposes.

92)    Defendant's Work Product is defective because it fails to adequately warn users of the

liability to which the use thereof exposes them. Regardless of whatever value Defendant's

Work Product may actually deliver to any user thereof, at all times, any user thereof incurs

liability not only for the misuse of that Work Product, but also for the Ordinary Use thereof,

including but not limited to Employment Law claims, FCRA claims, and potentially claims

for other Torts such as Defamation, or Breach of Contract.

93)    Defendant's Work Product is defective because it causes injury in the form of

destruction of Peoples' Lives. Nothing about the Paid Portion of Life waits on any person.

To whatever extent a person can live without Money, the Paid Portion of Life does require

the spending of Money. Any person not in possession of at least a Lifetime Supply of

Money must acquire it to spend. It is through "Employment" and "Commerce" combined

that almost all persons do so. Any person who chooses to live a Quality of Life wherein they

purchase or contract for the use of goods and services from others, must pay for them. All of

the most common necessities, comforts and conveniences of Life require constant payment

therefor. (Food, Clothing, Shelter, Family, Hygiene, Travel, all do.) For any person to

acquire these things legally as living Life demands, requires regular, and for the most part

constant revenue Generation. Any Article In Commerce that causes another party to not be

able to meet their chosen obligations to the Paid Portion of Life, when that person would

have been able to otherwise, but for the existence of that Work Product, destroys that

person's Life.

28

1

94)    In all cases and at all times, "Life" as used in Legal Matters, means in addition to any other terms, an Individual's Life, the Living thereof, the Circumstances thereof, and the Quality thereof.

95)    Any action by any party that reduces the Quality of another's Life by any amount, disrupts that persons Life. Any such action that reduces a Person's Quality of Life completely, destroys that person's Life. Disruptions as such include but are not limited to causing any delay in or prevention of any party receiving anything of value, or causing any delay in or prevention of any party providing anything of value to any other party. Each and every day that the reduction of Quality of Life persists, is a Continuing Injury. To whatever extent that the Work Product sold by Defendant "EBI" reduces a Persons' Quality of Life, or otherwise inhibits it, (that is, disrupts its growth, increase or improvement, however that may be defined or may exist), this constitutes Injury. To whatever extent that the Work Product sold by Defendant "EBI" disrupts or destroys a Person's ability to pay for the Necessities, Conveniences, and Comforts of Life, that Work Product causes Injury. No person can reasonably ever be considered to consent to such harm, and no waiver by any individual can legally excuse the sale of an Article In Commerce that causes such harm.

96)    Defendant's Work Product is defective because it causes persons who are fully qualified and productive, and who will never cause any of the kind of harm that Defendant's Work Product falsely promises to prevent, from continuing in Employment or Business that they have otherwise properly acquired, by destroying the Business Relationship in place between that person, and the Employing Party. In such cases Defendant's Work Product only caused harm to a person who was the subject of that Report, provided no actual value to its purchaser, and subjected the purchaser to certain liability. The only parties that do benefit in such an instance are "EBI", its employees, shareholders, officers, and their families. This amounts to a wrongful loss caused to the persons harmed, and a wrongful gain, benefit or

28    profit on the part of Defendant "EBI", its employees, shareholders, officers, and their

1 | families.

97)   Likewise in any case where a person believed that the use of Defendant's Work Product would or did protect them from harm by a person hired, and that person did ultimately cause harm, then Defendant's Work Product failed completely, and was only a false pretense from the outset. In such a case harm would have been caused, and it is unlikely that a refund for the cost of the Work Product would be curative. This is indicative of the level of risk included with the use of Defendant's Work Product. It is not the sort of Article In Commerce that if it does not work correctly, one can simply return it for a refund. If Defendant's "Product" does not work correctly, it leaves its user in a state of definite risk, or worse.

98)   In both such cases mentioned, determining those actual persons and number may be impossible, but by discovery Plaintiff may be able to find individuals who were rejected from one or more employments but later took some other employment and never caused harm. Likewise it may be possible to find individuals who were not rejected and did later cause harm. Such a determination requires deep discovery, but is probative toward the the actual effectiveness of Defendant's Work Product.

99)   Defendant's Work Product is defective because it fails to equally represent information about people from other countries.

100)  Defendant's Work Product is defective because as stated supra if it is used as a qualifying test, or tool, to determine employment qualification of an individual, then it is only valuable in qualifying individuals for employment by a Criminal Enterprise, and as such is certainly illegal.

28 | 101)  Defendant's Work Product is Defective because it takes too long to complete. In the

1

Instant Case, apparently because of that fact, the Client chose to proceed with the Business contracted with BallCam Technologies Inc., prior to the delivery of the Report by Defendant, again, making Defendant's Work Product entirely worthless, at least with regard to *pre-employment* screening because in this case the Report only served to terminate Business between other parties. Because of the delay inherent in the production of Defendant's Work Product, in all cases between one and three weeks most commonly, and yet longer in other cases, in all cases, Defendant's Work Product causes Business and Employment that was ready to begin immediately, and would have begun immediately but for the delay caused by Defendant fraudulently deceiving its customers into believing that they must use its "Product" to meet the Standard of Care in Employment Practices, to be permanently and irreparably lost. Simply put, when a span of time passes, and revenue is not generated during that period, that revenue is permanently lost. It can never be recouped retroactively, nor can it be practically be recouped from future business. Regardless of whether a party is an "Employee" or a Corporation in Contract, as in the Instant Case, their financial circumstances are essentially the same. They receive Revenue, but also have Expenses, and, those Expenditures are necessary to generate the Revenue. Revenue is always prospective, Expenditures are not. No stoppage of Revenue ever includes a concomitant cessation of expenses. In all such cases, a party involved in Employment or Business will have financial obligations to Creditors, that continue indefinitely, regardless of whether that party is receiving Revenue. Because such expenditures are paid weekly and monthly from Revenue received weekly and monthly, any loss of revenue for any time is financially damaging, and loss of Revenue for even a single Month can be devastating.

102) As such, each and every usage of Defendant's Work Product causes Employment and business to be delayed by an amount of time that is at minimum financially damaging, and may be financially devastating to a party by even a single use. When a party has Employment or Business terminated because of Defendant's Work Product, regardless of whatever time passes before another such opportunity is found, when it is, a person becomes

28

1

contractually bound by the "Background Check" process, is held in retainer for that period, but then receives no pay therefor. Each time a party seeking Business or Employment has Revenue from that Employment or Business, first delayed, and then terminated because of Defendant's Work Product, they are literally "ripped off" by the use of Defendant's Work Product. They have Revenue taken from them by Defendant. The Revenue lost by the use of Defendant's Work Product is not hypothetical nor prospective. Work that would otherwise begin, is put on hold until Defendant can complete their "Investigation". Then, upon completion of that Investigation, the Business or Employment that was offered and accepted, is then rescinded, purely because of a Report made by Defendant.

103)  In a "best-case-scenario" each time one financial opportunity is cost a person by Defendant, such a person will have another immediately available. Since Defendant's Article In Commerce is used to deny to and terminate Business and Employment with persons, this guarantees that persons in Plaintiff's circumstances will spend all their time waiting on "Background Checks" to complete, and be obstructed permanently from gaining Business or Employment, even with an infinite supply of potential opportunities before them. Because any delay or obstruction caused to the Employment or Business relations of others is tortious, any question of how much of that is ever allowable is a question for a Jury. What can be said for the purposes of this Count is that since Defendant by their Work Product is merely providing a Customer with copies of Public Records, those Records are or can be considered to be already available, publicly available, available free of charge, and available with ubiquity, from their original sources. If Defendant's claim that the nature or value of their Article In Commerce  is the "Investigation" of such Records, to obtain copies, then any delay such Investigation causes beyond the time it would take a party to obtain those same Records from their original sources without Defendant causes the Purchaser and the Subject of the Report to lose Revenue for having used that "Product".

28

104)  Because Defendant's Work Product is offered freely in Commerce to Businesses at

1

large, if the Work Product is not already in widespread use, it can be considered to be potentially so. Further, as a Business, Defendant has numerous financial obligations pursuant to that business, and a such has an absolute compelling interest in seeing to it that its "Product" is used in every Application possible.

105)  Because the use of Defendant's Work Product is specific to actualizing prospective Business and Employment matters, the delay that the use of Defendant's Work Product introduces into the actualization of those matters, and the irreparable loss of Revenue that accompanies it, affects the financial interests of the Nation as a Whole.

106)  Using Data from: http://www.bls.gov/news.release/pdf/empsit.pdf, It can be shown that based on a two-year average between 2014 and 2015, that annually as many as 2,748,000 new jobs are offered. Combined with economic data from the The CIA World Fact Book, it can be shown that the contribution to GDP per worker is around $125,000 annually, which amounts to $343,500,000,000 annual contribution to GDP from *new* jobs offered. Based on data from the "Society For Human Resources", between sixty nine and ninety percent of employers perform "Background Checks" for new employees via the use of a Consumer Reporting Agency. Because "Background Checks" delay Employment and Business for no less than one week, as long as three weeks, and in some cases, even longer, nationally, the lost annual contribution to GDP will be between $6,605,769,230.77 and $19,817,307,692.31 for delaying productivity between one and three weeks. Based on a Federal Tax rate of 25%, and aggregate State Taxes of 10%, (income and sales taxes), employers failing to pay persons during the "Background Check" process results in between $2,312,019,230.77, and $6,936,057,692.31 in lost Tax revenues to State and Federal Governments annually, in addition to lost contributions from the Employer's FICA requirements. As such, there is a Compelling National Interest in prohibiting the use of such "Products".

28

1

107)  In short, in all cases the use of Defendant's Article In Commerce causes the harms described in this Count. Because Defendant's Work Product causes injury each and every time it is used, and the only way to avoid such injury is to not use the "Product" at all, the "Product" is defective. And in fact, outright toxic. Any Work Product that cannot be used without causing injury, is a defective Work Product, regardless of which type Article In Commerce It is.

## V. Conclusion

108)  In all Counts supra, and at all times, Defendant "EBI" is liable because at all times Defendant knows what the Product it sells is used for, and how it is used.

109)  In all cases Defendant is liable because but for Defendant interloping in Plaintiff's business, Plaintiff would have completed the Contract with the Client. Plaintiff individually and properly secured contract business as a product of more then twenty years professional experience, and close to forty years life experience in the subject matter of his commercial business. Because the Report by Defendant caused Plaintiff to lose that Business by all the tortious claims made herein, Defendant is liable for that loss.

110)  At all times in this matter, all of the harms described in this complaint could have been prevented by Defendant "EBI" providing a copy of its Consumer Report to the Consumer before it is given to the procurer so the Consumer may correct any errors, or choose to instruct Defendant not to deliver the report. Because Defendant deliberately harms persons as described supra, by not providing a copy of its Report to the Consumer prior, Defendant "EBI" liable for all the harms caused to Plaintiff and other parties as described in this Complaint.

28

1

## VI. Relief Requested:

**Compensatory Damages:**

111)  Defendants be ordered by a Jury to pay Plaintiff his portion of the value of the Contract they caused to be terminated.

112)  Defendants be ordered by a Jury to pay the Statutory Amount of: $1,000 For each of the FCRA violations charged supra.

113)  Defendants be ordered by a Jury to pay Plaintiff the equivalent amount that he would have received in valuable consideration from BallCam Technologies Incorporated, for the Contract that was destroyed by Defendant.

**Punitive Damages:**

114)  A Jury award $100,000,000, or whatever amount it considers just, as Punitive Damages for the Outrage, and Life Destruction caused to Plaintiff by Defendants' Conduct, for the Social Offensiveness of "EBI"'s businesses practices, and as a Deterrent against Defendants continuing to cause the same harm to others.

**Declaratory Judgments:**

115)  Declaratory Judgment that the FCRA protects a Consumer's Right to review Consumer Reports PRIOR to them being disclosed to any other party, REGARDLESS of who procured the Report, and may upon such review prohibit that Report being furnished to any other party.

116)  Declaratory Judgment that per FCRA § 1681b(2) Plaintiff may instruct the Consumer Reporting Agency as to the Nature and Scope of the investigation being allowed by that Consumer.

28

1

117)  Declaratory Judgment that Plaintiff's Right To Privacy includes that he may permanently refuse to allow any Consumer Reporting Agency from ever reporting any information about them to any party.

118)  Declaratory Judgment that Plaintiff's Right To Privacy includes that he may permanently prohibit any Consumer Reporting Agency form ever investigating him in any way.

119)  Declaratory Judgment by a Jury that all individuals may permanently prohibit any Consumer Reporting Agency from revealing any record to any party for any reason, and that no Consumer Reporting Agency may ever report that it has been so prohibited.

120)  Declaratory Judgment by a Jury that Individual Privacy is a Fundamental Right, and that the Protection thereof is Guaranteed by our National Constitution.

121)  Declaratory Judgment by a Jury that in all cases that while a "Background Check" is proceeding, the subject of that Consumer Investigation is entitled to payment for that time, as wait-time, or in retainer, at the rate agreed for the work delayed by the "Background Check", for the period of that delay, and that during that period the "Background Check" is a contractual obligation thereto, between all parties involved.

**Injunctive Relief:**

122)  Preliminary Injunctions as needed to prevent ANY AND ALL further violations of the FCRA by Defendant "EBI".

123)  Preliminary Injunctions to compel Defendant "EBI" from retaining, publishing, nor reporting any information of any kind regarding Plaintiff.

28

1

124) A Jury permanently enjoin Defendant "EBI" from retaining, publishing, nor reporting any information of any kind regarding Plaintiff.

125) Preliminary Injunction and Issue of Warrant as needed to cease, desist, and prosecute any criminal conduct by Defendants related to this matter.

Submitted to the Court, This 18 May, 2021

Mr. Piero A. Bugoni, Plaintiff Pro – Se

Certificate of Filing and Delivery:

The Original of This Document was delivered to the Court In Forma Pauperis on 18 May, 2021, by Plaintiff, via United States First Class Mail.

28